**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| NEC CORPORATION,<br><br>    Plaintiff,<br><br>v.<br><br>OUR BODY ELECTRIC, INC.,<br><br>    Defendant. | Civil Action No. 22-986 (CJB) |
| NEC CORPORATION,<br><br>    Plaintiff,<br><br>v.<br><br>PELOTON INTERACTIVE, INC.,<br><br>    Defendant. | Civil Action No. 22-987 (CJB) |
| NEC CORPORATION,<br><br>    Plaintiff,<br><br>v.<br><br>TONE IT UP, INC.,<br><br>    Defendant. | Civil Action No. 22-988 (CJB) |

**RESPONSE TO THE HONORABLE JUDGE BURKE FROM PLAINTIFF REGARDING
DISPUTE OVER PROPOSED SUPPLEMENTAL PROTECTIVE ORDER**

Dated: April 27, 2023

Dear Judge Burke:

Plaintiff NEC Corporation ("NEC") respectfully submits this response letter regarding the parties' dispute over additional protections for Source Code Material ("Source Code Provisions") in a proposed Supplemental Protective Order ("SPO"). Defendants' Letter (D.I. 52 in Case No. 22-cv-987) fails to enunciate any specific risks that NEC's proposal would pose and relies instead on broad assertions of sensitivity of source code in general, and Defendants' cited authority is distinguishable. Defendants' proposals would be overly burdensome to NEC and should be rejected.

A.     **Use of a laptop or electronic device for the sole purpose of note-taking while inspecting Source Code under monitoring**

Defendants' Letter fails to articulate why the SPO's existing measures would be insufficient to safeguard the confidentiality and security of Source Code Materials. As outlined in NEC's initial letter, strict legal and technical measures exist to prevent unauthorized copying or recording of source code. (D.I. 51 at 2.) Defendants acknowledge that the inspection will be "on an air-gapped computer . . . to prevent the electronic exfiltration" of source code and do not explain why an air-gapped computer, coupled with additional measures, is not sufficient to prevent "electronic exfiltration." (D.I. 52 at 1.) *See Rmail Ltd. v. Amazon.com, Inc.*, No. 2:10-CV-00258-TJW, 2011 WL 13404919, at *1-*2 (E.D. Tex. June 1, 2011) ("agree[ing] with Plaintiff that portions of Defendants' proposed protective order, as it relates to source code access and disclosure, could be overly burdensome" and ruling that "notes may be taken electronically on the personal computers of persons authorized under the Protective Order to inspect the source code"). Nor is Defendants' personal supervision "limit[ed]" for this purpose as Defendants assert—Defendants are allowed to monitor visually the source code inspection with a direct line of sight, (D.I. 51 Ex. B ¶34(b)), which is more than sufficient to capture any alleged unauthorized copying or recording.

Moreover, to the extent Defendants are still not reassured, NEC is willing to work with Defendants in good faith on the types and specifics of any laptop computer or electronic devices used for notetaking, e.g. by physically sealing off any cameras of those devices or using a device furnished by Defendants. *See, e.g.*, *Taction Tech., Inc. v. Apple Inc.*, No. 21-cv-00812-GPC-JLB, 2021 WL 4150342, at *8 (S.D. Cal. Sept. 13, 2021) (adopting a stipulated protective order permitting "a single laptop computer, provided by the Producing Party, without Internet access or network access to any other computer, which may be used by the Receiving Party to take notes relating to the Source Code but may not copy the Source Code into the notes.  . . . The Receiving Party may attach a USB thumb drive to the single authorized laptop computer for the sole purpose of copying notes").

Defendants make no concessions and now cite the District's Default Standard for Access to Source Code ("Default Standard"), asserting that "the Default Standard does not permit notetaking of any kind." (D.I. 52 at 1.) But, the Default Standard is silent on the issue of notetaking. While it does provide that "[s]ource code may not be printed or copied," Defendants fail to cite any authority showing that the provision is a prohibition on notetaking. Indeed, the undisputed portion of ¶34(a) of the proposed SPO provides: "For the avoidance of doubt, the copying of variable, function . . .  in notes are not considered a copy of any portion of the source code for the purposes of this paragraph." (D.I. 51, Ex. B ¶34(b).) Therefore, the parties did not understand

notetaking and "copying" to be the same thing.

Defendants' reliance on the Special Master's opinion in *Inventor Holdings, LLC v. Wal-Mart Stores, Inc.*, No. 13-cv-96-GMS, 2014 WL 4370320, at *3 (D. Del. Aug. 27, 2014), is also inapposite. That decision states that "any device that could undermine that [impervious] environment [for source code review] would jeopardize the integrity" of the source code. *Id.* The plaintiff in that case also ruled out the option of taking notes on an air-gapped computer pre-approved by Defendants. *Id.* Neither is applicable here, and NEC is not seeking to bring in devices that would undermine the source code review environment.

Further, Defendants now question why handwritten notes are inadequate and electronic notetaking is necessary. There is obvious efficiency to electronic notetaking. Accordingly, because Defendants have failed to articulate any specific reason that existing measures are insufficient to protect against the alleged "electronic exfiltration" or propose any additional measures, Defendants have no reasonable justification to insist on a blanket prohibition against electronic notetaking. NEC's proposal should be adopted.

B.      **Number of hard copy printouts of the specific lines, pages, or files of the Source Code Material**

As explained in NEC's initial letter, NEC's counsel team includes Baker Botts attorneys from three U.S. offices; providing for only three copies of printouts leaves no copies available for experts or consultants. It is irrelevant that Defendants are willing to allow source code inspections in multiple locations. (D.I. 52 at 2.) Live inspection and printouts of excerpts are not substitutes for each other but serve different purposes because experts or consultants' work, including preparation of testimony and reports in their own offices, will likely require consultation of such printouts. Further, it is also irrelevant that other provisions allow Plaintiff's outside counsel and experts to include short electronic excerpts and images of source code in necessary submissions or exhibits, because such provisions do not alleviate the need for printouts of excerpts and NEC's counsel is prohibited from creating electronic copies by itself. (D.I. 51, Ex. B ¶34(m).)

Defendants' Letter provides no explanation why two additional copies of printouts will jeopardize the confidentiality and security of their source code. Defendants assert that "Defendants' interest in limiting the number of physical copies . . . strongly outweighs Plaintiff's interest in having looser restrictions . . . ." (D.I. 52 at 2.) Not only is this untrue, but Defendants have also not provided any facts tied to this case in support of this assertion.

Defendants cite a string of cases, but none are applicable here. In *Via Vadis Controlling GmbH v. Skype, Inc.*, No. 12-cv-193-RGA, 2013 WL 646236, at *3 (D. Del. Feb. 21, 2013), the court was asked to compel production for proceedings outside the United States (in Germany and Luxembourg) under 28 U.S.C. § 1782. In *TQ Beta, LLC v. DISH Network Corp.*, No. 14-cv-848-LPS, D.I. 32, Oral Order (D. Del. Apr. 1, 2015), the court's oral order dealt with a prosecution bar, acquisition bar, and location of source code review, not copies of printouts. In *Data Engine Techs. LLC v. Google Inc.*, No. 14-cv-1115-LPS, D.I. 33, Oral Order (D. Del. Apr. 8, 2015), the order addressed acquisition bar, prosecution bar, and prohibition of taking information abroad, and did not address source code excerpt printouts. *STC.UNM v. Intel Corp.*, No. 10-cv-1077-RB-WDS, D.I. 171 (D.N.M. Jan. 6, 2012) dealt with a peculiar situation where the information at issue was

2

Intel's extremely confidential manufacturing process information that is export restricted for national security reasons, and Intel "produced credible evidence" to prove that. *Id.* D.I. 171 at 1. Further, in *Tessera, Inc. v. Broadcom Corp.,* No. 16-cv-380-LPS, Oral Order (D. Del. Nov. 7, 2016), there was no dispute between the parties regarding the number of hard copy printouts. Both parties' proposals provided for "one (1) hard copy print out of the specific lines or pages" (*Id.* D.I. 51-1 at 15 (plaintiff's proposal) and 21 (defendant's proposal)).[1]

### C.     Whether outside consultants or experts authorized under the Protective Order may keep copies in a secured locked area in their offices

As explained in NEC's initial letter and again above, NEC's experts and consultants will likely need to consult printouts of source code excerpts in their work including preparation of testimony and reports. Source code inspection is no substitute for that, and it is unreasonable and unduly burdensome to require that experts and consultants travel to offices of counsel each and every time they work on such tasks.

Here, Defendants again fail to articulate any specific risk that will be caused by NEC's proposal. Defendants' characterization of NEC's position as demanding a "*carte blanche* permission to maintain [hard copy printouts] in the offices of as-yet undisclosed outside experts and consultants" ignores the other protective order provisions. While NEC has not identified experts and consultants to-date, before disclosure of Source Code Materials, consultants or experts are required to complete the Undertaking to be bound by the Protective Order at least ten (10) days before given access, and Defendants are given the opportunity to object. (D.I. 45 ¶5.) As such, any experts or consultants who will actually access the source code will have been thoroughly vetted by both parties. Further, NEC's proposal requiring consultants or experts to keep the printouts "in a secured locked area in [their] offices" imposes meaningful restrictions, and Defendants fail to provide any reason why this is insufficient. Indeed, parties routinely propose, and courts routinely adopt, protective orders with such provisions,[2] *see e.g. Samsung Display Co. v. Solas Oled Ltd.*, No. 1:21-cv-07201, 2021 WL 5154142, at *4 (S.D.N.Y. Nov. 5, 2021); *Philips N. Am. LLC v. Summit Imaging Inc.*, No. 2:19-cv-01745, 2020 WL 2085153, at *7 (W.D. Wash. Apr. 30, 2020); *Realtime Data LLC v. Acronis, Inc.*, No. 17-cv-11279, 2017 WL 9292268, at *4 (D. Mass. Nov. 28, 2017), and Defendant Peloton itself has voluntarily agreed to such provisions. (D.I. 51 at 3.)

For the reasons stated above and in NEC's initial letter, NEC respectfully submits that its proposals should be adopted.

---

[1] The reference to "limiting the number of high-resolution hard-copy printouts" in the court's order appears to relate to the real dispute at issue, which was over the so-called "GDS files" containing Broadcom's integrated circuit designs; defendant Broadcom proposed providing up to 20 high-resolution hard-copy partial printouts while plaintiff Tessera sought 50 electronic screenshots of each of Broadcom's GDS files. *Id.* D.I. 51 at 2, 3; D.I. 52 at 3.

[2] Unlike *Infinite Data LLC v. Intel Corp.*, C.A. No. 14-391-RGA, D.I. 29 (D. Del. Aug. 8, 2014), the number of locations available for live inspection is not at issue here, and defendant resisted plaintiff's proposal allegedly because the plaintiff in that case sought to allow expert to store "top secret" Intel circuitry design at their home or office. *Id.* D.I. 28 at 2, 3.

Respectfully,

*/s/ Kenneth L. Dorsney*

Kenneth L. Dorsney (3726)

cc: All Counsel of Record (via CM/ECF and electronic mail)